UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESA, LLC, | Case No.  15-cv-05574-KAW |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| FAMILY TRUST OF KIMBERLEY AND ALFRED MANDEL, et al., | Re: Dkt. No. 13 |
| Defendants. | |

The Family Trust of Kimberly and Alfred Mandel, Richard "Dick" Taylor, 2000 Jackson Family Trust, James Fisher, and Christine Williams ("Defendants")[1] move to dismiss Lesa, LLC's ("Plaintiff") complaint for failure to state a claim upon which relief can be granted.  Plaintiff opposes the motion.  The Court held a hearing on the motion on April 7, 2016.  For the reasons set forth below, the motion is GRANTED IN PART AND DENIED IN PART.  Plaintiff is granted leave to amend the complaint within 14 days of this order.

## I.    BACKGROUND

### A.    Factual background

INSITEsource Corporation ("Insite") was founded in 2012 to exploit the assets of another company, Blue Hawk, Inc., which were owned by Montage Capital LLC ("Montage").  (Am. Compl. ("FAC") ¶¶ 10, 11, Dkt. No. 12.)  On April 13, 2012, Insite signed a promissory note with Montage for $925,000.  (*Id.* ¶ 12.)  Insite then raised over $500,000 from a number of investors, including some of the defendants.  (*Id.* ¶ 13.)  Each investor, including Defendants Taylor, Jackson, and Mandel, were informed of Montage's senior debt.  (*Id.* ¶ 14.)  Each investor signed a

---

[1] On stipulation of the parties, Defendants 2000 Jackson Family Trust and Richard "Dick" Taylor were dismissed from this action.  *See* Apr. 1, 2016 Stip. & Order, Dkt. No. 20.

United States District Court
Northern District of California

subordination agreement, which states, in pertinent part:

> Each Creditor will not demand or receive from Borrower (and Borrower will not pay to such Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise, nor will such Creditor exercise any remedy with respect to the Collateral, nor will such Creditor accelerate the Subordinated Debt, or **commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower**, until such time as (i) the Senior Debt is fully paid in cash, (ii) Lender has no commitment or obligation to lend any further funds to Borrower, and (iii) all financing agreements between Lender and Borrower are terminated.

(*Id.* ¶ 15 (emphasis added in original).)[2]

Insite and Montage then entered into a loan and security agreement providing that "Event[s] of Default" would occur upon "any 'change in management, or if any senior level manager or 'c' level officer of the Borrower ceases to devote substantially all of his or her time to Borrower's business and operations.'" (*Id.* ¶ 16.) Defendants were aware of the loan security agreement and the secured nature of the debt Insite owed Montage at all times. (*Id.*)

Beginning in the fall of 2014, investors and signatories to the subordination agreement, including Defendants Fisher and Williams "engaged in a plan to 'seize' control of Insite by absconding with the Company's passwords, business assets, and other properties and to the software system Insite was providing to multiple paying customers." (*Id.* ¶ 17.) One investor and signatory to the subordination agreement, Gregory Rossmann, "also purported to fire Peter Nordberg, the CEO, in direct breach of the [agreement]." (*Id.*) The attempted seizure of Insite's assets and the change in management triggered a default under the secured promissory note and the loan security agreement. (*Id.* ¶ 19.) Insite filed suit in San Francisco Superior Court on

---

[2] A copy of the subordination agreement is appended to the operative complaint and Defendants' motion to dismiss. FAC, Ex. 1; Defs.' Mot., Ex. A. A copy of the cross-complaint filed in the state court action is also attached to Defendants' motion. Defs. Mot., Ex. B. While courts generally do not consider material beyond the pleadings in ruling on a motion to dismiss, Plaintiff's complaint refers to, and relies on, the subordination agreement, and the Court has thus considered it here under the incorporation-by-reference doctrine. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The Court will also construe the submission of the cross-complaint as a request for judicial notice and grant the request, as the cross-complaint is a true and correct copy of a court document that is not subject to reasonable dispute. *See* Fed. R. Evid. 201; *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases."). The cross-complaint asserts claims for misrepresentation, fraud, and deceit, negligent misrepresentation, and breach of fiduciary duty and duty of loyalty, among others. Defs.' Mot., Ex. B.

1   October 31, 2014, seeking clarification as to its legal rights and return of its assets.  (*Id.* ¶ 18.)

2          On February 13, 2015, Defendants, among others, filed a cross-complaint against

3   Montage, Insite, and affiliates.  (*Id.* ¶ 20.)  Plaintiffs allege that the filing of the cross-complaint

4   "was a repudiation and breach of the Subordination Agreement and was further cause of a default

5   on the Secured Promissory Note and the LSA owned by Montage and to which Defendants, and

6   each of them, were subordinated by contractual obligation, fiduciary duty, and applicable law."

7   (*Id.*)  Montage, in turn, was forced to incur substantial legal fees and costs, had to sell debt for a

8   fraction of its worth, and gave "notice to the investors in Montage that write-down[s] had occurred

9   of over $800,000 on their investment in Montage[,] reflecting a small portion of the damages

10  Montage has actually suffered."  (*Id.* ¶ 21.)  Plaintiff asserts that it is the assignee of the claims

11  arising out of the damages to Montage.  (*Id.* ¶ 4.)

12         **B.      Procedural background**

13         Plaintiff commenced this action on December 4, 2015.  (Compl., Dkt. No. 1.)  Defendants

14  filed a motion to dismiss on December 23, 2015.  (Defs.' Mot., Dkt. No. 7.)  Plaintiff filed a

15  response to the motion on January 6, 2016, and on January 19, 2016, Plaintiff filed an amended

16  complaint, asserting claims for breach of contract, tortious interference with contract, and

17  declaratory relief.  (Pl.'s Opp'n, Dkt. No. 10; FAC ¶¶ 22-26, 27-33.)  Defendants then filed a

18  second motion to dismiss on February 2, 2016.  (Defs.' Mot., Dkt. No. 13.)  Because it appeared

19  that Defendants were treating the amended complaint as the operative complaint, the Court

20  terminated the motion filed on December 23, 2015.  (Feb. 3, 2016 Order, Dkt. No. 15.)  Plaintiff

21  filed its opposition to the instant motion to dismiss on February 16, 2016.  (Pl.'s Opp'n, Dkt. No.

22  16.)  Defendants' reply followed on February 23, 2016.  (Defs.'s Reply, Dkt. No. 17.)  The Court

23  held a hearing on the motion on April 7, 2016.

24         **II.      LEGAL STANDARD**

25         Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based

26  on the failure to state a claim upon which relief may be granted.  A motion to dismiss under Rule

27  12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  *Navarro v. Block*, 250

28  F.3d 729, 732 (9th Cir. 2001).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In considering such a motion, a court must "accept as true all of the factual allegations

2 contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation

3 omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or

4 there is an absence of "sufficient factual matter to state a facially plausible claim to relief."

5 *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing

6 *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation

7 marks omitted).

8    A claim is plausible on its face when a plaintiff "pleads factual content that allows the

9 court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

10 *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate

11 "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

12 will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

13    "Threadbare recitals of the elements of a cause of action" and "conclusory statements" are

14 inadequate.  *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co*., 83 F.3d 1136, 1140 (9th

15 Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat

16 a motion to dismiss for failure to state a claim.").  "The plausibility standard is not akin to a

17 probability requirement, but it asks for more than a sheer possibility that a defendant has acted

18 unlawfully . . .  When a complaint pleads facts that are merely consistent with a defendant's

19 liability, it stops short of the line between possibility and plausibility of entitlement to relief."

20 *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

21    Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no

22 request to amend is made "unless it determines that the pleading could not possibly be cured by

23 the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations

24 omitted).

25    **III.    DISCUSSION**

26    **A.    Whether Plaintiff has alleged a viable breach of contract claim**

27    To state a breach of contract claim under California law, a plaintiff must establish "(1) the

28 existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4)

damage resulting from breach."  *Reichert v. Gen. Ins.*, 68 Cal. 2d 822, 830 (1968).

Here, Plaintiff alleges that Defendants entered into a subordination agreement with Montage, that Defendants breached the agreement by filing a cross-complaint in state court and supporting Rossmann's efforts to seize control of Insite, that Montage performed its obligations under the agreement, and that the material breaches by Taylor, Jackson, and Mandel have caused Plaintiff to suffer damages in excess of $800,000.  (FAC ¶¶ 22-26.)

Plaintiff's breach of contract claim rests on the provision of the subordination agreement that contains the following language:  "nor will such Creditor . . . commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower."  (*Id.* ¶ 15.)

Defendants challenge the third element of Plaintiff's breach of contract claim, that is, whether the filing of the cross-complaint constitutes a breach of the subordination agreement. (Defs.' Mot. at 7.)  Defendants argue that the above provision of the agreement bars actions to enforce the subordinated debt, not all actions outright.  (*Id.*)  Based on this reading, Defendants contend that the filing of a cross-complaint in state court does not constitute a breach of the subordination agreement, and as such, is not a viable basis for Plaintiff's breach of contract claim.[3] (*Id.*)

In its opposition, Plaintiff argues that the clause barring legal actions is clear such that "no claims may be brought because they will harm Insite and prevent payment of the debt, consistent with the total purpose of that agreement."  (Pl.'s Opp'n at 1.)

Contract interpretation is a question of law to be determined by the court.  *See TRB Investments, Inc. v. Fireman's Fund Ins.* Co., 40 Cal. 4th 19, 27 (2006).  California law makes clear that "[t]he fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties."  *Id.*  The intent of the parties "at the time the contract is formed" governs, and this intent is to be ascertained, if

---

[3] Defendants also challenge the viability of Plaintiff's breach of contract claim to the extent it is based on Defendants' support of Rossmann's efforts to seize control of Insite.  Defs.' Mot. at 10-11.  Plaintiff does not address this in its opposition.  At the hearing, Plaintiff clarified that the basis for the breach of contract claim is the alleged breach of the subordination agreement.

United States District Court
Northern District of California

possible, solely from the written provisions of the contract.  Cal. Civ. Code §§ 1636, 1639.

"Generally subordination agreements may be classified as being one of two types:  debt subordinations or property interest subordinations."  *Three Rivers Bank of Mont. v. North End Timber Prods., LLC (In re North End Timber Prods., LLC)*, Ch. 11 Case No. 06-60440-7, Adv. No. 07-00014, 2007 WL 4468706, *7 (Bankr. D. Mont. Dec. 17, 2007).

> In a debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant.  If the debt subordination is "complete," the subordinated creditor is barred from receiving payments until the superior debt is paid in full.
>
> Debt subordinations are routinely utilized when a corporate or partnership borrower seeks financing from a commercial lender.  The commercial lender will insist that all indebtedness of the corporation or partnership to management or other insiders be subordinated to the lender's proposed financing.  The lender demands subordination for reasons more than just security; the lender wants its loans to be used as working capital in the borrower's business and not just to repay insider debts.
>
> Debt subordination should be contrasted to property interest subordination. In a property interest subordination, the agreement affects only the relative rights of parties in particular real or personal property.  Property interest subordination does not concern any rights the parties may have to receive payments.

*Id.* at *8 (quoting *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990)).

Consistent with the goals of such subordination agreements, the parties' agreement contained the following recitals:

> A.    INSITEsource Corporation, a California corporation ("Borrower"), has requested and/or obtained certain loans or other credit accommodations from Lender [Montage] which are or may be from time to time secured by assets and property of Borrower [Insite].
>
> B.    Each Creditor has extended loans or other credit accommodations to Borrower [Insite], and/or may extend loans or other credit accommodations to Borrower [Insite] from time to time, including pursuant to that certain Note Purchase Agreement dated as of October 7, 2013 and as amended from time to time.
>
> C.    In order to induce Lender [Montage] to extend credit to Borrower [Insite] and, at any time or from time to time, at Lender's [Montage's] option, to make such further loans, extensions of credit, or other accommodations to or for the account of Borrower [Insite], or to purchase or extend credit upon any instrument or writing in respect of which Borrower [Insite] may be liable in any capacity, or to grant such renewals or extension of any such loan, extension of credit, purchase, or

other accommodation as Lender [Montage] may deem advisable, each Creditor is willing to subordinate: (i) all of Borrower's [Insite's] indebtedness and obligations to such Creditor, whether presently existing or arising in the future (the "Subordinated Debt") to all of Borrower's [Insite's] indebtedness and obligations to Lender [Montage] (including, without limitation, principal premium (if any), interest, fees, charges, expenses, costs, professional fees and expenses, and reimbursement obligations); and (ii) all of such Creditor's security interests, if any, in Borrower's [Insite's] property, to all of Lender's [Montage's] security in the Borrower's [Insite's] property.

(Defs.' Mot., Ex. A at 1.)  As Defendants argue, these recitals reflect the general intent of the subordination agreement—prioritizing Insite's debt and obligations to Montage over Insite's debt and obligations to the other creditors (including Defendants).  (Defs.' Mot. at 9.)

Plaintiff's proposed interpretation of the subordination agreement is an improper attempt to reformulate the parties' intent.  Under Plaintiff's reading of the agreement, "[n]othing in the Subordination Agreement bars any claims by anyone—it simply requires such claims to be put on hold until the Secured Debt has been paid."  (Pl.'s Opp'n at 2.)  Adopting this reading, however, requires the Court to expand the purpose of the agreement, and necessarily, the definition of Subordinated Debt, to include actual and potential claims that may be asserted against Insite, irrespective of whether the claim concerned a debt or security interest, such that the cross-complaint Defendants filed in state court would constitute the type of "administrative, legal or equitable action" contemplated by paragraph 3.  This Court declines to transform the creditors' agreement that "they would delay and defer any rights they have to monies from Insite until after the senior, secured debt was paid," *see* Pl.'s Opp'n at 1, into an agreement to delay and defer any rights (even if unrelated to the collection of the subordinated debt) to seek redress for wrongful conduct.

As Plaintiff concedes, "the first three clauses are more specific in reference to collections of the new debt":

Each Creditor will not demand or receive from Borrower (and Borrower will not pay to such Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise, nor will such Creditor exercise any remedy with respect to the Collateral, nor will such Creditor accelerate the Subordinated Debt . . . .

(Pl.'s Opp'n at 2, Defs.' Mot., Ex. A at 1.)  The Court cannot simply ignore these first three clauses in interpreting the meaning of the fourth clause, which provides:  "nor will such Creditor . . . commence, or cause to commence, prosecute or participate in any administrative, legal or

equitable action against Borrower." (Defs.' Mot., Ex. A at 1.) Rather, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civil Code § 1641. Thus, this Court reads the fourth clause as prohibiting a creditor from commencing any administrative, legal or equitable action against the Borrower concerning the Subordinated Debt, a term which the agreement expressly defines as "all of Borrower's [Insite's] indebtedness and obligations to such Creditor, whether presently existing or arising in the future," and not any and all potential claims Creditor may have against Insite.[4] (*See* Defs.' Mot., Ex. A at 1.) The filing of the cross-complaint, then, is not the type of proceeding contemplated by paragraph 3. It concerns allegations of fraud, negligent misrepresentation, and other similar conduct. As such, it does not give rise to the purported breach on which Plaintiff's breach of contract claim rests. This warrants dismissal of the cause of action.

At the hearing, however, Plaintiff suggested two new theories for its breach of contract claim that were not alleged in the complaint and were not briefed in the opposition to Defendants' motion to dismiss. First, Plaintiff argued that Defendants breached the subordination agreement by failing to obtain Montage's consent prior to filing suit. Assuming that the subordination agreement requires such consent, Plaintiff may be able to allege facts that, if true, would show that Defendants breached the agreement by not obtaining such consent. Second, Plaintiff argued that the cross-complaint is the functional equivalent of an action to collect on Defendants' subordinated debt. If Plaintiff can allege facts establishing that the cross-complaint constitutes such an action, it may have a viable basis for its breach of contract claim.

Accordingly, Plaintiff's breach of contract claim is DISMISSED WITH LEAVE TO

---

[4] Defendants point out that the expansive reading Plaintiff proposes may be at odds with California Civil Code § 1668, which provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Defs.' Mot. at 10. Plaintiff does not address this issue in its opposition. At the hearing, Plaintiff argued that one of its new theories—that Defendants did not seek Montage's consent prior to filing the cross-complaint—does not run afoul of this provision. The Court will revisit this issue if and when Defendants move to dismiss Plaintiff's second amended complaint on this ground. Upon initial review of the agreement, however, the Court has not found a consent provision that would apply to the filing of the subject cross-complaint.

United States District Court
Northern District of California

AMEND.[5]

### B.     Whether Plaintiff lacks standing to assert its claim for tortious interference with contract

The elements of a tortious interference with contract claim are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1133 (9th Cir. 2015).

Plaintiff alleges that Defendants were aware of the loan security agreement, that the agreement required that there be no changes to "c" level management, and that Defendants made performance of the agreement more expensive and difficult by supporting the attempt to oust Insite's CEO. (FAC ¶¶ 27-29.) Plaintiff further alleges that Defendants intended to disrupt the performance of the loan security agreement and knew that such disruption was certain or substantially certain to occur. (*Id.* ¶ 30.)

Defendants argue that Lesa's claim for intentional interference with contract must be dismissed. (Defs.' Mot. at 4.) Defendants specifically contend that the claim is personal to Montage, the aggrieved party, and Lesa, though the assignee of the claim, is not the real party in interest. (*Id.*) It moves for dismissal of the claim on this ground. (*Id.*)

Relying on California Civil Code § 954, which provides that "[a] thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner[,]" Plaintiff asks that Defendants' motion be denied. (Pl.'s Opp'n at 3.) It offers three arguments in support. First, Plaintiff argues that "the mere fact that Defendants could not cite authority to support the argument that interference claims are not assignable defeats their argument of non-assignability." [6] (*Id.*) Second, Plaintiff argues that the interference claim does

---

[5] At the hearing, Defendants conceded that granting leave to amend would be appropriate so that Plaintiff has an opportunity to allege that the cross-complaint is the functional equivalent of an action that is contemplated by the subordination agreement.

[6] Plaintiff's first argument—that Defendants' position fails because they cited no authority in support—does not bear prolonged discussion. The same can be said of Plaintiff. It has not cited to a single authority that squarely holds that a claim for tortious interference with contract may be

United States District Court
Northern District of California

not seek personal or emotional damages, but economic damages as in *Timed Out, LLC v. Youabian, Inc*, 229 Cal. App. 4th 1001, 1010 (2014).  Third, Plaintiff relies on *White Mountains Reinsurance Company of America v. Borton Petrini, LLP*, 221 Cal. App. 4th 890, 897 (2013) in advancing its argument that "even if the interference claim did somehow partially fall under the exception, the fact that it was part of the transfer of a larger package of rights, including a contract claim, allows even personal rights to be transferred."  (Pl.'s Opp'n at 4.)

The general rule of assignability set forth in California Civil Code § 954 applies to causes of action such as breach of contract or damages to personal or real property.  *Martin v. Bridgeport Cmty. Ass'n, Inc.*, 173 Cal. App. 4th 1024, 1032 (2009).  "Exceptions to the general rule of assignability under section 954 are choses in action for wrongs done to the person, the reputation or the feelings of the injured party, and to contracts of a purely personal nature."  *Id.*  These include "slander, assault and battery, negligent personal injuries, criminal conversation, seduction, breach of marriage promise, malicious prosecution, and others of like nature."  *Reichert*, 68 Cal. 2d at 834.  With this framework in mind, the Court must decide whether a cause of action for tortious interference with contract may be assigned.  This turns on whether it is a wrong of a purely personal nature.  *See id.*

Defendants would have the Court classify a claim for tortious interference with contract as a wrong of a purely personal nature.  (Defs.' Mot. at 5.)  To support their position, Defendants cite *Applied Equipment Corporation v. Litton Saudi Arabia Limited*, 7 Cal. 4th 503, 515 (1994).  In that case, the California Supreme Court held that a contracting party cannot be held liable in tort for conspiracy to interfere with its own contract.  *Id.* at 507.  In reaching that holding, the Court acknowledged, "California recognizes a cause of action against noncontracting parties who interfere with the performance of a contract.  It has long been held that a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract."  *Id.* at 513 (citation and quotations omitted).  "In this way, the expectation that the parties will honor the terms of the contract is protected against officious intermeddlers."  *Id.* (citation and quotations

assigned.  *See generally* Pl.'s Opp'n.

United States District Court
Northern District of California

omitted).  The Court clarified that:

> One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers-- interlopers who have no legitimate interest in the scope or course of the contract's performance.

*Id.* at 514.

This duty, Defendants argue, "is similar to the non-assignable tort of malicious prosecution."  (Defs.' Mot. at 5.)  According to Defendants, "[m]alicious prosecution involves a duty not to bring an action against a person without probable cause and in bad faith."  (*Id.*)  Defendants also argue that this duty is "similar to the non-assignable tort of fraud[, which] involves a duty not to make misrepresentations of fact that are intended to, and do, result in the detrimental reliance of the person to whom the fraud is directed."  (*Id.*)

Defendants' attempt to analogize these causes of action to Plaintiff's claim for tortious interference with contract fails.  The case law discussing the rationale behind the nonassignability of a different claim, legal malpractice, illustrates why.

"California courts have consistently held legal malpractice claims are nonassignable to protect the integrity of the uniquely personal and confidential attorney-client relationship."  *Fireman's Fund Ins. Co. v. McDonald, Hecht & Soldberg*, 30 Cal. App. 4th 1373, 1383 (1994).  "The attorney-client relationship (although containing contractual elements) is unique and involves a highly personal and confidential relationship, making the relationship more analogous to a contract of a personal nature than to an ordinary commercial contract, and rendering claims for negligent breach thereof nonassignable."  *Id.* at 1381-82 (internal quotations, citations, and modifications omitted).  Thus, "although choses in action for property or pecuniary losses are generally assignable, a claim for legal malpractice is more akin to those types of claims which are not assignable, i.e., claims for personal injury, wrongs of a purely personal nature (such as injuries to the reputation or feelings of the injured party) or breaches of contracts of a purely personal nature (such as promises of marriage)."  *Id.* at 1381.  As one appellate court explained in the seminal decision on the nonassignability of legal malpractice claims:

> It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke

11

public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his clients. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397 (1976).

A stranger's duty not to interfere with a contract between two other parties is more attenuated than the duty a lawyer owes to his client. Along these lines, the policy considerations underpinning the rule of nonassignability of legal malpractice claims are not implicated here.[7] Commercial relationships between sophisticated business entities may be interrupted for a number of reasons, intentional or otherwise—market conditions change, industries shift, capital is mismanaged, etc. A stranger's decision to meddle in parties' dealings is just one example of some

---

[7] There is one exception to the rule of nonassignability of legal malpractice claims, which is explained in a case cited by Plaintiff in connection with its second argument—*White Mountains Reinsurance Company of America v. Borton Petrini, LLP*, 221 Cal. App. 4th 890, 910 (2013). There, "the assignment of the legal malpractice claim was only a small, incidental part of a larger commercial transfer between insurance companies involving the transfer of assets, rights, obligations, and liabilities." *Id.* at 909. The court thus reasoned that the transaction did not implicate the policy considerations behind the rule of nonassignability. *Id.* While Plaintiff suggests that the case is analogous to the one at bar, it has not pointed to any allegations in the complaint, or any other facts that may be properly considered on a motion to dismiss, to support that contention. *See generally* FAC; Pl.'s Opp'n. *White Mountains* allowed an auto-insurer's successor-in-interest to bring a malpractice action against a law firm the insurer had hired. *Id.* at 895. Plaintiff has offered nothing to suggest that it has a similar relationship with Montage, the apparent assignor of the interference claim Plaintiff asserts in this action. *See* FAC ¶ 4 ("Plaintiff LESA . . . is the assignee of the claims alleged herein and the damages suffered by Montage as alleged herein."). That case, then, is not persuasive here. Nonetheless, as discussed above, Plaintiff need not rely on the *White Mountains* exception. In this limited respect, Defendants are correct in their assertion that "[t]he holding of *White Mountains* does not apply." *See* Defs.' Reply at 7.

1    of the unpredictable risks inherent to these types of relationships and business transactions.  In this

2    respect, the duty any such officious intermeddler owes to contracting parties is greatly unlike the

3    unique duty of loyalty an attorney owes to her client.  For these reasons, the Court concludes that a

4    claim for tortious interference with contract is not personal in nature and may, therefore, be freely

5    assigned.

6            The Court must now consider how Plaintiff's prayer for punitive damages factors into the

7    analysis.  In its opposition, Plaintiff describes its claim for tortious interference with contract as

8    one that "does not seek personal or emotional damages, but economic damages."  (Pl.'s Opp'n at

9    4.)  It relies on *Timed Out, LLC v. Youabian, Inc.*, 229 Cal. App. 4th 1001 (2014) for the

10   proposition that a claim involving purely pecuniary interests are assignable.  (Pl.'s Opp'n at 4.)

11   Plaintiff asserts that it, like the plaintiffs in *Timed Out*, "seeks economic damages related to

12   pecuniary interests, namely the harm done to the contractual relationship between Insite and its

13   secured creditor."[8]  (*Id.*)

14           This characterization does not save Plaintiff's prayer for punitive damages associated with

15   tortious interference.  Punitive damages, however, are a type of relief, not a cause of action in

16   itself.  Defendants argue that Plaintiff's prayer for punitive damages reflects the personal nature of

17   Plaintiff's claim for intentional interference with contract.  (Defs.' Mot. at 6; Defs.' Reply at 5 n.1.)

18   Not so.  At least in the context of damages arising from a claim for breach of the covenant of good

19   faith and fair dealing, claims for punitive damages are unassignable even when the underlying

20   claim can be assigned.  *Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937, 942 (1976).  Courts have

21   applied this principle to acknowledge the general rule favoring assignment of claims but also to

22   prevent an assignee from seeking punitive damages.  *See Dorroh v. Deerbrook Ins. Co.*, 612 Fed.

United States District Court
Northern District of California

---

24   [8] In light of this, the Court presumed that Plaintiff intended to withdraw its prayer for punitive
25   damages, as such damages are nonpecuniary in nature.  *Kopczynski v. The Jacqueline*, 742 F.2d
     555 (9th Cir. 1984) (because Jones Act damage awards were limited to pecuniary losses, punitive
     damages were not recoverable, as "[p]unitive damages are non-pecuniary.").  At the hearing,
26   Plaintiff expressed no such intention.  Rather, Plaintiff argued that punitive damages are generally
     available for intentional torts under California law.  Still, Plaintiff pointed to no authority holding
27   that such damages are available to an assignee of an intentional tort for which punitive damages
     may be recovered.

28

1   App'x 424, 426 (9th Cir. 2015) (bankruptcy trustee could only transfer economic aspect of debtor's

2   bad faith claim against insurer); *GATX/Airlog Co. v. Evergreen Int'l Airlines, Inc.*, 52 Fed. App'x

3   940, 942 (9th Cir. 2002) (assignee could not seek punitive damages "under California law, which

4   bars the assignment of claims for punitive damages"); *Drazan v. Atlantic Mut. Ins. Co.*, No. C 10-

5   01371 SI, 2010 WL 2629576, at *4 (N.D. Cal. June 29, 2010) (plaintiffs asserting claims for

6   breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and unfair

7   competition could not recover punitive damages as assignees); *McColm v. Foremost Ins. Co.*, No.

8   C 09-04132 SI, 2010 WL 1691681, at *2 (N.D. Cal. Apr. 23, 2010) (assignees' claims for punitive

9   damages and emotional distress failed as a matter of law); *Ham v. Cont'l Ins. Co.*, No. 08-1551

10  SC, 2008 WL 4287563, at *3 (N.D. Cal. Sept. 17, 2008) ("It is undisputed, and Plaintiffs do not

11  argue otherwise, that under California law, punitive damages may not be assigned.").  The Court

12  follows these decisions here.  Therefore, while Plaintiff may assert Montage's claim for tortious

13  interference with contract as an assignee, Plaintiff may not recover punitive damages in that

14  capacity.

15       Accordingly, Plaintiff's prayer for punitive damages is dismissed.

16       **C.      Whether Plaintiff's claim for declaratory relief is moot**

17       Plaintiff alleges a claim for declaratory relief as its third and final cause of action.  (FAC ¶

18  34-37.)  It seeks a declaration as to the parties' rights and obligations under the subordination

19  agreement and the loan and security agreement.  (*Id.* ¶ 35.)

20       Defendants argue that Plaintiff's claim for declaratory relief is moot because its first two

21  claims for relief are subject to dismissal for failure to state a claim upon which relief can be

22  granted.  (Defs.' Mot. at 11.)  As discussed above, however, Plaintiff is granted to leave amend its

23  breach of contract claim, and Plaintiff's tortious interference with contract claim survives the

24  instant motion.  Accordingly, Defendants' motion to dismiss Plaintiff's claim for declaratory relief

25  is DENIED.

26                      **IV.     CONCLUSION**

27       For the reasons set forth above, Defendants' motion to dismiss is GRANTED IN PART

28  AND DENIED IN PART.  Plaintiff's breach of contract claim is DISMISSED WITH LEAVE TO

1    AMEND.  Plaintiff's claim for punitive damages is DISMISSED WITHOUT LEAVE TO

2    AMEND.  Defendants' motion is otherwise DENIED.  Plaintiff shall file its amended complaint

3    within 14 days.

4           IT IS SO ORDERED.

5    Dated: 04/13/2016

6                                                    _____
                                                     KANDIS A. WESTMORE
7                                                    United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California