UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESA, LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>FAMILY TRUST OF KIMBERLEY AND ALFRED MANDEL, et al.,<br><br>   Defendants. | Case No. 15-cv-05574-KAW<br><br>**ORDER GRANTING MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 33 |

  Defendants Alfred Mandel and Gregory Rossman move to dismiss Plaintiff LESA, LLC's second cause of action for breach of contract for failure to state a claim upon which relief can be granted. (Defs.' Mot., Dkt. No. 33.) Defendants Mandel, Rossman, James Fisher, and Christine Williams also move for partial summary judgment on the third cause of action for tortious interference with contractual relations. Defendant Andrew Chase joins on both motions. (Dkt. No. 38.) Plaintiff opposes the motion. The Court held a hearing on the motion on November 3, 2016. For the reasons set forth below, the motion to dismiss is GRANTED and the motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

### A. Factual Background

  INSITEsource Corporation ("Insite") was founded in 2012 to exploit the assets of another company, BlueHawk, Inc., which was owned by Montage Capital LLC ("Montage"). (Second Am. Compl. ("SAC") ¶¶ 12, 13, Dkt. No. 25.) On April 13, 2012, Insite signed a promissory note with Montage for $925,000. (*Id.* ¶ 14.) Insite then raised over $500,000 from a number of investors, including Defendants Mandel, Rossman, and Alfred Chase. (*Id.* ¶ 16.) Each investor

1   was informed of Montage's senior debt, and signed a Subordination Agreement with Montage and

2   Insite which states, in pertinent part:

> Each Creditor will not demand or receive from Borrower (and Borrower will not pay to such Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise, nor will such Creditor exercise any remedy with respect to the Collateral, nor will such Creditor accelerate the Subordinated Debt, **or commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower**, until such time as (i) the Senior Debt is fully paid in cash, (ii) Lender has no commitment or obligation to lend any further funds to Borrower, and (iii) all financing agreements between Lender and Borrower are terminated.[1]

(*Id.* ¶ 17 (emphasis added in SAC).)[2]

Insite and Montage then entered into a Loan and Security Agreement ("LSA"), which provided that "Event[s] of Default" would occur upon "any 'change in management, or if any senior level manager or 'c' level officer of the Borrower ceases to devote substantially all of his or her time to Borrower's business and operations.'" (*Id.* ¶ 18.)  It is disputed whether Defendants knew of the LSA; Defendants Rossman, Mandel, Fisher, and Williams have submitted declarations stating that they were not aware of the LSA.  (Rossman Dec. ¶ 10, Dkt. No. 34; Mandel Dec. ¶ 6, Dkt. No. 35; Fisher Dec. ¶ 6, Dkt. No. 36; Williams Dec. ¶ 6, Dkt. No. 37.)  Mr. Nordberg (the CEO of Insite) and Mr. Michael Pohl (the former CFO of Insite) have submitted declarations stating that they had conversations with Defendants Rossman and Fisher regarding the LSA, including whether Mr. Nordberg's removal would constitute a violation of Insite's agreement with Montage barring a change in C-level officers.  (Nordberg Dec. ¶¶ 13-14, Dkt. No. 49-2; Pohl Dec. ¶ 7, Dkt. No. 7.)

---

[1] "Creditors" are investors such as Defendants, "Borrower" is Insite, and "Lender" is Montage.

[2] A copy of the subordination agreement is appended to the operative complaint.  (SAC, Ex. 2.)  A copy of the cross-complaint filed in the state court action was also attached to Defendants' prior motion to dismiss, and considered by the Court in its ruling.  (Dkt. No. 13-2.)  While courts generally do not consider material beyond the pleadings in ruling on a motion to dismiss, Plaintiff's complaint refers to, and relies on, the subordination agreement, and the Court has thus considered it here under the incorporation-by-reference doctrine.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The Court previously took judicial notice of the cross-complaint, and will continue to do so here.  (Ord. at 2 n.2, Dkt. No. 22.)

In the fall of 2014, investors and signatories to the subordination agreement—including Defendants Rossman, Fisher, and Williams—"engaged in a plan to 'seize' control of Insite by absconding with the Company's passwords, business assets, and other properties and to the software system Insite was providing to multiple paying customers." (SAC ¶ 19.) One investor and signatory to the subordination agreement, Mr. Rossman, also purported to fire Mr. Nordberg "in direct breach of the LSA." (*Id.*) The attempted seizure of control and change in management triggered a default under the secured promissory note and LSA. (*Id.* ¶ 21.)

On October 31, 2014, Insite filed a lawsuit in San Francisco Superior Court, seeking clarification of its legal rights and return of its assets. (*Id.* ¶ 20.) On February 13, 2015, Defendants, among others, filed a cross-complaint against Montage, Insite, and affiliates. (*Id.* ¶ 22.) Plaintiff alleges that the filing of the cross-complaint "was a repudiation and breach of the Subordination Agreement and was a further cause of a default on the Secured Promissory Note and the LSA owned by Montage and to which Defendants, and each of them, were subordinated by contractual obligation, fiduciary duty, and applicable law." (*Id.*) Montage, in turn, was forced to incur substantial legal fees and costs, had to sell debt for a fraction of its worth, and gave "notice to the investors in Montage that write-down had occurred of over $800,000 on their investment in Montage[,] reflecting a small portion of damages Montage has actually suffered." (*Id.* ¶ 23.) Plaintiff asserts that it is the assignee of the claims arising out of the damage to Montage. (*Id.* ¶ 4.)

**B.     Procedural Background**

Plaintiff commenced this action on December 4, 2015. (Compl., Dkt. No. 1.) In response to Defendants' motion to dismiss, Plaintiff filed an amended complaint on January 19, 2016. (First Am. Compl., Dkt. No. 12.) Defendants filed a second motion to dismiss on February 2, 2016. (Dkt. No. 13.)

On April 13, 2016, the Court issued an order granting in part and denying in part Defendants' motion to dismiss. (Ord., Dkt. No. 22.) Plaintiff filed its second amended complaint on April 27, 2016. Plaintiff added allegations that the technology industry's customary practice was to block all claims until the senior debt is paid, and that the objective of the cross-complaint

3

was to overcome the Subordination Agreement, "which is precisely the relief which would be offered by the factually equivalent case of a suit on the Note which is also expressly barred." (SAC ¶ 54.) Plaintiff also identified fifteen alleged breaches by Defendants, which demonstrate that the cross-complaint claims were "functionally and essentially the same as if not equivalent to a claim to recover their investment regardless of the express terms of the Subordination Agreement . . . ."  (*Id.* ¶ 56.)

Defendants then filed the instant motion to dismiss and motion for partial summary judgment, along with declarations by Defendants Rossman, Mandel, Fisher, and Williams. On May 31, 2016, Defendant Andrew Chase filed a joinder in both motions. (Dkt. No. 38.) Mr. Chase also provided a declaration which stated that he had no knowledge of the LSA. (Chase Dec. ¶ 3, Dkt. No. 38 at 4.) On June 14, 2016, Plaintiff filed its opposition, along with declarations by Michael Draper, Mr. Nordberg, and Mr. Pohl. (Plf.'s Opp'n, Dkt. No. 49.) On June 21, 2016, Defendants Rossman, Mandel, Fisher, and Williams filed their reply, which Defendant Chase joined in. (Defs.' Reply, Dkt. No. 50; Dkt. No. 51.)

## II.   LEGAL STANDARD

### A.   Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In considering such a motion, a court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation marks omitted).

A claim is plausible on its face when a plaintiff "pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Threadbare recitals of the elements of a cause of action" and "conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co*., 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.").  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . .  When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

### B.     Motion for Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.  Where the

moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Id.* (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.     DISCUSSION

#### A.     Motion to Dismiss Breach of Contract Claim

To state a breach of contract claim under California law, a plaintiff must establish: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4)

6

1  damage resulting from breach." *Reichert v. Gen. Ins.*, 68 Cal. 2d 822, 830 (1968).  At issue is
2  whether Defendants' filing of the cross-complaint constitutes breach of the Subordination
3  Agreement.
4        Defendants argue that the Subordination Agreement is meant to bar actions to enforce the
5  Subordinated Debt, whereas "[a]n action for rescission for fraud in the inducement is a different
6  creature altogether.  As opposed to enforcing the Subordinated Debt, an action for rescission seeks
7  to extinguish the Subordinated Debt and to return the parties to where they were before the
8  contract was entered."  (Defs.' Mot. at 6-7.)
9        In general, "[a]n action for rescission is based on the disaffirmance of the contract," while
10 "an action for damages for breach of contract is based on its affirmance.  An action for rescission
11 and an action for breach of contract are alternative remedies."  *Akin v. Certain Underwriters At*
12 *Lloyd's London*, 140 Cal. App. 4th 291, 296 (2006).  Thus, "[t]he remedy based upon the existence
13 of the contract . . . is inconsistent with the remedy based upon its nonexistence."  *Id.* at 297
14 (internal quotation omitted).  Whereas rescission is meant "to restore the parties to the position
15 they would have been in had they not entered the contract," damages due under a breach of
16 contract claim is meant to compensate the non-breaching party "for the loss of his 'expectational
17 interest'—the benefit of his bargain which full performance would have brought."  *Id.* at 298.
18       Here, Plaintiff argues that the Subordination Agreement was designed not only to prevent
19 investors from recovering on the Subordinated Debt, but to prevent actions to rescind the
20 Subordinated Debt itself.  (Plfs.' Opp'n at 12.)  In support, Plaintiff point to the fifteen potential
21 breaches listed in their complaint.  (*Id.*)  According to the complaint, these breaches demonstrate
22 that the cross-complaint was "functionally and essentially the same . . . if not equivalent to a claim
23 to recover their investment regardless of the express terms of the Subordination Agreement."
24 (SAC ¶ 56.)  The problem with this argument, however, is that the fifteen potential breaches are
25 dependent on the Subordination Agreement prohibiting a creditor from seeking to rescind the
26 Subordinated Debt in the first place; in short, the fifteen alleged "breaches" are only a breach if
27 rescission is prohibited by the Subordination Agreement to begin with.  This is further emphasized
28 by Plaintiff's admission at the hearing that the fifteen breaches are dependent on the cross-

complaint seeking rescission. For example, Plaintiff cited to the subordination agreement's bar on obtaining a judgment against Insite, and the bar on seeking priority of debt ahead of Montage. (*See* SAC ¶¶ 56(4), 56(7).) Thus, for any of the fifteen alleged "breaches" to constitute an actual breach, the rescission action must itself be prohibited by the Subordination Agreement. In short, the question is whether the Subordination Agreement actually prohibits rescission actions.

In its order on Defendant's prior motion to dismiss, the Court declined to read the Subordination Agreement as delaying a creditors' "rights (*even if unrelated to the collection of the subordinated debt*) to seek redress for wrongful conduct." (Ord. at 7 (emphasis added).) There, the primary question was whether the rescission action was permitted by paragraph 3 of the Subordination Agreement, specifically the fourth clause which read: "nor will such Creditor . . . commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower." (*Id.* at 7-8.) The Court found that "the general intent of the subordination agreement [was] prioritizing Insite's debt and obligations to Montage over Insite's debt and obligations to the other creditors (including Defendants)." (*Id.* at 7.) Thus, to the extent Plaintiff alleged that the Subordination Agreement barred all legal actions until the debt to Montage was paid, the Court explained that this was:

> an improper attempt to reformulate the parties' intent. . . . Adopting this reading . . . requires the Court to expand the purpose of the agreement, and, necessarily, the definition of Subordinated Debt, to include actual and potential claims that may be asserted against Insite, irrespective of whether the claim concerned a debt or security interest, such that the cross-complaint Defendants filed in state court would constitute the type of "administrative, legal or equitable action" contemplated by paragraph 3. This Court declines to transform the creditors' agreement that "they would delay and defer any rights they have to monies from Insite until after the senior, secured debt was paid," [citation] into an agreement to delay and defer any rights (even if unrelated to the collection of the subordinated debt) to seek redress for wrongful conduct.

(*Id.*)

The Court proceeded to review the language of the Subordinated Agreement, and found that the first three clauses of paragraph 3 were "more specific in reference to collections" of the debt. (*Id.* at 7 (internal quotation omitted).) The Court explained that it could not "simply ignore these first three clauses in interpreting the meaning of the" broader fourth clause, but had to read

8

1  the contract as a whole. (*Id.* at 7-8.) Thus, the Court found that the Subordination Agreement's
2  clause prohibiting the commencement of any administrative, legal, or equitable action against the
3  Borrower was limited to actions concerning the Subordinated Debt, and that "[t]he filing of the
4  cross-complaint . . . is not the type of proceeding contemplated by paragraph 3 [because i]t
5  concerns allegations of fraud, negligent misrepresentation, and other similar conduct." (*Id.* at 8.)
6  The Court therefore dismissed the breach of contract claim, but allowed Plaintiff to amend to
7  allege its new theories that Defendants had to obtain Plaintiff's consent prior to filing suit or that
8  the cross-complaint was the functional equivalent of an action to collect on Defendant's
9  subordinated debt. (*Id.*)

10  In its opposition, Plaintiff does not provide any legal argument that the cross-complaint
11  was the functional equivalent of an action to collect on the Subordinated Debt. Such an argument
12  would be difficult to make, given the legal distinction between an action to rescind a contract and
13  an action to enforce a contract. An action to collect on a Subordinated Debt seeks payment of the
14  benefits due under the debt, whereas an action to rescind the Subordinated Debt seeks to repudiate
15  its very existence. *See Akin*, 140 Cal. App. 4th at 298. While they may have the same practical
16  effect in this case, they are still two different legal claims with different remedies. *See id.* at 296.
17  The fact that the remedies in this case have the same effect does not affect whether Defendants
18  were allowed to file the cross-complaint seeking rescission in the first place.

19  Instead, Plaintiff again argues that the Subordination Agreement was designed to prevent
20  the rescission action, despite the Court's prior ruling. (Plf.'s Opp'n at 12.) Plaintiff does not cite to
21  any particular language in the contract, instead citing various allegations in its complaint, which
22  also do not cite to any specific language of the Subordination Agreement. Thus, the Court again
23  concludes that based on the language of the Subordination Agreement, the Subordination
24  Agreement is ultimately premised on the existence of the Subordinated Debt and the collection of
25  that debt, which is distinct from a remedy based on the repudiation of that debt.

26  To the extent that Plaintiff argues that it is the technology industry's "'customary practice'
27  to 'block all claims until the senior debt is paid,'" this allegation is not a factual allegation that
28  must be accepted as true. *Compare with Gleason v. Glasscock*, No. 2:10-cv-2030-MCE-EFB,

2012 WL 1131438, at *6 (E.D. Cal. Mar. 29, 2012) (finding statements about the California Horse Racing Board's "customary practice of automatic license renewals for licensees in good standing" to be conclusory). Moreover, the complaint states that this alleged customary practice is encompassed in the Subordination Agreement; this Court, however, has already found that the Subordination Agreement is not so broad. (SAC ¶ 41; Ord. at 7-8.)[3]

Finally, Plaintiff briefly argues that Defendants were required to seek permission from Montage before filing their cross-complaint, citing to paragraph 51 of its Second Amended Complaint. (Plf.'s Opp'n at 12.) Paragraph 51, however, states that the Subordination Agreement "prohibits [Defendants] from collecting *on their debt* before the senior creditor, Montage, except as may be authorized by Montage and its successors." (SAC ¶ 51 (emphasis added).) As discussed above, a rescission action does not seek to collect on a debt but to repudiate it entirely, and Plaintiff fails to cite to any language or legal authority that would broaden the scope of the Subordination Agreement to include a rescission action.

The Court concludes that the Subordination Agreement was not meant to prevent a rescission action, which is a legally distinct action from an attempt to enforce and collect on the Subordinated Debt. Thus, the filing of the cross-complaint does not constitute a breach of the Subordination Agreement.

At the hearing, Plaintiff suggested that even if the Subordinated Debt was rescinded, the Subordination Agreement would still prevent Defendants from seeking to recover any judgment against Insite. Plaintiff cites no contract language or case law in support, and the Subordination Agreement itself concerns the subordination of loans made by Defendants as *creditors*, not any debt that Insite happens to owe Defendants, even if completely unrelated to money loaned by

---

[3] Plaintiff also argues that in seeking to receive Insite's assets by requesting a constructive trust, the cross-complaint directly contravened the Subordination Agreement's provision that creditors are not to seek to sell or transfer Insite's assets. (Plf.'s Opp'n at 12.) As Defendants point out, the cross-complaint's request for a constructive trust was based on alleged fraud, a claim that is not covered by the Subordination Agreement. Indeed, reading the Subordination Agreement to prevent Defendants from bringing suit based on fraud would be contrary to California public policy. *See* Cal. Civ. Code § 1668 ("All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of law.")

Defendants to Insite. For example, the Recitals of the Subordination Agreement make that clear, as it focuses on the "loans or other credit accommodations" extended by "Creditors" such as Defendants. (Subordination Agreement, ¶ B.)

Because this is the third complaint, and the Court's second order on this issue, Plaintiff's second cause of action for breach of contract is dismissed with prejudice.

### B. Motion for Summary Judgment on Tortious Interference with Contract Claim

Plaintiff's third cause of action is for tortious interference with contract. To allege a claim for tortious interference, Plaintiff must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1603 (2009). "[C]onsistent with its underlying policy of protecting the expectations of contracting parties against frustration by *outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with contract does not lie against a party to the contract." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994). In this case, Plaintiff alleges that Defendants "disrupt[ed] the performance of the LSA" by supporting the attempt to remove Mr. Nordberg as CEO. (SAC ¶¶ 64, 65.)

Defendants make two arguments for why summary judgment should be granted. First, Defendants contend "[e]ach of the Defendants lacked the requisite knowledge of the LSA necessary to be liable for intentionally interfering with it." (Defs.' Mot. at 10.) In support, Defendants provide declarations from Rossman, Mandel, Fisher, Williams, and Chase, which each state that they were not aware of the LSA. (Rossman Dec. ¶ 10; Mandel Dec. ¶ 6; Fisher Dec. ¶ 6; Williams Dec. ¶ 6; Chase Dec. ¶ 3.)[4] Plaintiff, in turn, provide declarations by Nordberg and Pohl which describe conversations with Rossman and Fisher, in which they discussed the possible

---

[4] Plaintiff objects to Defendants' declarations on the ground that they are "hopeless conclusory and self-serving and moves to strike all five in their entirety." (Plf.'s Opp'n at 15.) To the extent that Defendants state that they had no knowledge of the LSA, the Court denies the objection. Each of the Defendants is describing, under penalty of perjury, a matter that they would have personal knowledge of. They are not improper legal arguments or conclusions, or based on hearsay. Accordingly, Plaintiff's objections are overruled.

replacement of Nordberg and whether that would lead to a breach of the LSA. (Nordberg Dec. ¶¶ 13, 14; Pohl Dec. ¶ 7.) Plaintiff also provides an e-mail in which the LSA was e-mailed to Rossman. (Nordberg Dec., Exh. 5.) This is sufficient to raise a dispute of material fact as to Rossman and Fisher. With respect to Mandel, Williams, and Chase, however, Plaintiff provides no evidence that any of these three individuals had knowledge of the LSA. At the hearing, Plaintiff could only point to general statements such as Nordberg's statement that Insite "was always transparent and forthright" about Insite's relationship with Montage; this statement alone does not show that Mandel, Williams, or Chase knew specifically about the LSA or that the replacement of Nordberg would lead to a breach of the LSA. (Nordberg ¶ 9.) Similarly, Draper's statement that Chase hated Nordberg because he did not want to be removed does not suggest that Chase knew about the LSA provisions. Thus, because Defendants have produced evidence negating an essential element of a tortious interference with contract claim, and Plaintiff has failed to set forth any specific facts that would show that Mandel, Williams, and Chase had knowledge of the LSA, the Court grants summary judgment in favor of Mandel, Williams, and Chase on Plaintiff's third cause of action.

Second, Defendants argue that Fisher, an Insite employee, and Rossman, a member of Insite's Board of Directors, cannot be liable for tortious interference because they were acting as agents for Insite, and agents for Insite cannot be held liable for interfering with Insite's own contract. (Defs.' Mot. at 10.) In general, a company "cannot act except through [its] agents." *Shoemaker v. Myers*, 52 Cal. 3d 1, 25 (1990). Furthermore, "'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract.'" *Mintz*, 172 Cal. App. 4th at 1604 (quoting *Shoemaker*, 52 Cal.3d at 24). At least one court has found, however, that a tortious interference "claim can be stated where the third party (employee) was acting to protect his own interests rather than that of the entity." *Butler v. Sears Roebuck & Co.*, No. C 92-1842 FMS, 1992 WL 364779, at *4 (N.D. Cal. Oct. 20, 1992).

In the instant case, the parties dispute whether Fisher and Rossman were acting out of their own self-interest, or if they were acting on behalf of the corporation. (Plf.'s Opp'n at 16-18; Defs.' Reply at 7-8.) Defendants argue that Rossman acted to replace Nordberg as CEO to help Insite

acquire additional financing, as he believed Nordberg's personal bankruptcy would dissuade others from investing with the company, and that Fisher had no involvement beyond acting under the instructions of the board of directors when he acted to prevent Nordberg from accessing Insite's systems. (Rossman Dec. ¶¶ 3-4; Fisher Dec. ¶ 5.) Plaintiff paints a starkly different picture, alleging that Fisher was personally involved in convincing Michael Draper – another Insite board member – to remove Nordberg as CEO, and that Rossman was concerned about litigation being filed against the board members if they did not oust Nordberg. (Draper Dec. ¶¶ 9-12, Dkt. No. 49-1.) Plaintiff further alleges that the reason given by Rossman and Fisher to lock Nordberg out of Insite's system was not to prevent Nordberg from retaliating for being replaced as CEO but "to prepare the Company's assets for transfer so that the new Board of Directors and additional new shareholders they intended to introduce could take over the Company's assets as quickly as possible." (Draper Dec. ¶ 24.) At the hearing, Plaintiff also argued that Fisher's position was in sales, and thus his attempts to oust Nordberg would fall outside the scope of his employment. Considering the evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in Plaintiff's favor, the Court finds there is a genuine dispute of material fact as to whether Rossman and Fisher were acting in the interests of Insite or their own self-interest. Thus, the Court denies summary judgment on the third cause of action as to Rossman and Fisher.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED, and Plaintiff's breach of contract claim is DISMISSED WITH PREJUDICE. Defendants' motion for summary judgment as to Plaintiff's tortious interference with contract claim is GRANTED as to Defendants Mandel, Williams, and Chase, and DENIED as to Defendants Rossman and Fisher.

IT IS SO ORDERED.

Dated: November 8, 2016

_____
KANDIS A. WESTMORE
United States Magistrate Judge